## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRITTANY GRANT,** | : | **No. 4:23cv1932** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **NEXSTAR MEDIA GROUP, INC. d/b/a** | : | |
| **THE HILL; NEXSTAR MEDIA, INC.** | : | |
| **d/b/a THE HILL; and CAPITOL** | : | |
| **HILL PUBLISHING CORP. d/b/a** | : | |
| **THE HILL,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Brittany Grant asserts discrimination and retaliation claims against her former employers pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Pennsylvania Human Relations Act, 42 PA. STAT. § 951, *et seq.* ("PHRA"). Defendants Nexstar Media Group, Inc., Nexstar Media, Inc., and Capitol Hill Publishing Corp. deny that they terminated Grant based on her sex or disability. Defendants deny that they terminated plaintiff after she complained of discrimination. Before the court are the four (4) remaining motions in limine filed by the parties. Plaintiff seeks to preclude evidence, testimony, and argument regarding defendants' affirmative defense that she failed to mitigate her damages. Defendants seek to preclude evidence

and testimony related to internal investigations into the conduct of Grant's supervisor, Wil Danielson, after he terminated the plaintiff.  With trial scheduled to commence on November 17, 2025, this memorandum addresses the parties' unresolved motions in limine to the extent that they may be considered in the absence of a trial record.

**Background**

As alleged in her complaint, Grant served as an associate publisher for *The Hill*.[1]  (Doc. 1, ¶¶ 14, 34).  *The Hill* focuses its journalism on politics and government policy and is published online and in print.  As discussed below, Grant's job responsibilities as associate publisher focused on advertising sales and marketing in a managerial role.

Plaintiff was hired at *The Hill* in 2015. Id. ¶ 32.  In October 2017, plaintiff's medical providers diagnosed her with stage 4 chronic kidney disease, which progressed to end-stage renal failure. Id. ¶ 38.

On March 9, 2020, Grant underwent surgery for a kidney transplant. Id. ¶ 39.  She returned to work approximately three months later after a medical leave of absence, working remotely from her home office in Lycoming County,

---

[1] Due to the parties' failure to file exhibits with their motions *in limine*, the court cites to Grant's complaint in the background section of this memorandum.  The court makes no determination as to the ultimate veracity of these assertions.

Pennsylvania. Id. ¶¶ 12, 40.  According to plaintiff, she consistently performed her job duties in a highly competent manner. Id. ¶ 35.

At some point in 2021, Nexstar Media Group, Inc. acquired *The Hill*.  In December 2021, Grant began reporting to Richard "Wil" Danielson, senior vice president of digital sales. Id. ¶¶ 36, 41.  Danielson reported to Lori Tavoularis, executive vice president and chief revenue officer. Id. ¶ 37.  At all times relevant to this action, Jason Jedlinski served as general manager. Id. ¶ 53.  Grant alleges that Danielson, Tavoularis, and Jedlinski were aware of her kidney disease and transplant history. Id. ¶¶ 43–44, 57.

On March 30, 2022, Grant experienced an infection related to her kidney transplant. Id. ¶ 64.  She required hospitalization.  From March 30, 2022 to April 3, 2022, plaintiff took a leave of absence from work to address her medical issues. Id. ¶ 65.

On April 14, 2022, Grant experienced another infection related to her kidney transplant, which resulted in a rehospitalization. Id. ¶ 67.  From April 14, 2022 to April 19, 2022, plaintiff required a second leave of absence to tend to her medical needs. Id. ¶ 68.

Grant returned to work on April 19, 2022. Id. ¶ 69.  Approximately eight (8) days later, on April 27, 2022, Grant complained to Wil Danielson about disability discrimination, that is, she explained to him that, "it felt like she was being

penalized and treated worse following, and as a result of, her recent disability-related medical leave." Id. ¶¶ 70–71.

Grant further alleges that she experienced different treatment than male and nondisabled employees. Id. ¶ 47.  According to the plaintiff, she was told to smile more and turn on her camera during virtual meetings, while male, non-disabled colleagues were not. Id. ¶¶ 49–50.  Grant also asserts that she was told that she was passive aggressive while her male, nondisabled colleagues were not.

Regarding Jason Jedlinski, the general manager, Grant contends that he interfered with her work in an attempt to prevent her from succeeding. Id. ¶ 55. According to Grant, Jedlinski spoke to her in a condescending, intimidating manner. Id. ¶ 53.  Grant contends that Jedlinski did not treat male, nondisabled employees like he treated her. Id. ¶¶ 54, 56.

On May 13, 2022, approximately 18 days after returning from her second medical leave, Grant met with Wil Danielson, Lori Tavoularis, and Emily Anderson, a human resources ("HR") employee. Id. ¶ 72, 81.   Defendants provided Grant with two options: 1) resign from her employment and be paid three months of compensation (in exchange for a full release of all claims against defendants with confidentiality and non-disparagement provisions); or 2) remain employed but be subject to a performance improvement plan ("PIP"). Id.  Faced

4

with these options, Grant did not resign. Id. ¶ 74.  She continued in her

employment subject to the PIP.

The PIP stated that Grant needed to: "Improve verbal & written

communication with Senior Leadership – Communicate clearly, mitigate passive

aggressive comments, attend meetings on camera," and make "no negative

comments about team members." Id. ¶ 76.  Grant contends that her work

performance did not warrant a PIP. Id. ¶ 75.  Rather, according to Grant, she was

subject to these conditions because of her sex, her disability, and because she

had recently taken medical leave related to her disability. Id. ¶ 83.

On June 21, 2022, Grant rebutted what she describes as false statements

and misrepresentations pertaining to her PIP in an email to Danielson,

Tavoularis, and Anderson. Id. ¶¶ 84–85.  Specifically, Grant wrote:

> *I was completely blindsided [by] our conversation on May 13th and was in utter shock with the feedback provided in the performance improvement plan and that I was presented with 'the alternative' of resignation with three months of severance.  This is particularly troublesome both in the timing on the heels of my return from medical leave and as I've been nothing but awarded and appreciated in the past for my dedication, loyalty, and results.  I believe that I have been discriminated against because of my sex and my medical condition.  As previously indicated, I am writing this as an addendum to my performance improvement plan presented to me.*

Id. ¶ 85.

5

Other than an email from Tavoularis acknowledging receipt of the email, Grant received no further communication from defendants' decision-makers regarding her sex and disability discrimination complaints. Id. ¶¶ 86–87.

Grant's PIP conditions ended on or about July 1, 2022. Id. ¶ 94.   She then filed a complaint with the Pennsylvania Human Resources Commission ("PHRC") on July 11, 2022, alleging that defendants discriminated against her because of her sex and her disability. Id. ¶ 89.  Grant forwarded a copy of her PHRC complaint to Danielson, Tavoularis, Anderson, and Kari Torgerson, a regional HR director for the defendants. Id. ¶ 90.

Eleven (11) days later, on July 22, 2022, Danielson and Tavoularis terminated Grant's employment. Id. ¶ 92.  According to Grant, the defendants' decision-makers stated that she did not meet the conditions of the PIP. Id. ¶ 93. Consequently, on July 26, 2022, Grant filed a second complaint with the PHRC, alleging that she was terminated by defendants because of her sex, disability, and for engaging in protected activity. Id. ¶¶ 28, 104.  Both PHRC complaints were cross-filed with the Equal Employment Opportunity Commission ("EEOC"). Id. ¶¶ 27–28.  Subsequently, the EEOC issued right-to-sue letters in August 2023. Id. ¶¶ 29–30.  She filed this action in the Middle District of Pennsylvania on November 22, 2023.

6

In response to the complaint, defendants filed an answer with affirmative defenses, denying any wrongdoing. (Doc. 11). In their answer, defendants advance that they terminated Grant for failure to meet the performance objectives set forth in the PIP. Id. ¶ 93. Moreover, among other asserted affirmative defenses, defendants contend that Grant's claims for damages are barred or should be reduced by her failure to mitigate those damages. Id., Sixth Affirmative Defense, ECF p. 19.

Following a period of discovery and expiration of the dispositive motions deadline, the court set this matter for pretrial conferences. In accordance with the court's pretrial orders, the parties filed motions in limine. Following oral argument and with matters still remaining fluid in the days prior to trial, the court issues this memorandum.

**Jurisdiction**

The court has federal question jurisdiction over plaintiff's ADA and Title VII claims. 28 U.S.C. § 1331. The court has supplemental jurisdiction over plaintiff's PHRA claims. 28 U.S.C. § 1367(a).

**Standard of Review**

Under the Federal Rules of Evidence, the court "must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." FED. R. EVID. 104(a). The court may make rulings on

motions in limine pursuant to its inherent authority to manage the course of trials. Luce v. United States, 469 U.S. 38, 41 n.4 (1984).

The purpose of a motion in limine is "to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069 (3d Cir. 1990). They are generally "not designed to eliminate claims or theories[.]" Forrest v. Parry, 930 F.3d 93, 111 (3d Cir. 2019).

**Analysis**

### 1. Plaintiff's Motion to Preclude Failure-to-Mitigate Evidence at Trial

Grant's only motion in limine seeks to preclude evidence, testimony, and argument regarding any potential failure-to-mitigate defense at the time of trial. (Doc. 39). Defendants oppose the motion. (Doc. 42).

This case involves discrimination and retaliation claims under the ADA, Title VII, and the PHRA. [2] Plaintiff seeks, among other things, compensatory damages for her emotional pain and suffering and equitable relief in the form of back pay and front pay. (Doc. 1 at 14–15). Plaintiff also requests punitive damages. Id. Grant's complaint demands a jury trial. Id. at 1.

---

[2] The PHRA is interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently. Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002) (citation omitted). To the extent that the text of PHRA differs from the ADA and Title VII in any critical manner, these issues are not relevant for disposition of the plaintiff's motion in limine.

Under the law, the determination of damages in this case involves a shared role where the jury will determine whether plaintiff is entitled to compensatory and punitive damages, see 42 U.S.C. § 1981a(c)(1),[3] while the determination of whether plaintiff is entitled to back pay and front pay will be reserved for the court, see 42 U.S.C. § 2000e–5(g) (authorizing back pay as a form of equitable relief that the court may award upon a finding of intentional discrimination); 42 U.S.C. § 12117 (incorporating the remedies in Title VII to "any person alleging discrimination in violation of" the ADA); Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 848, 854 (2001) (holding that front pay was not an element of compensatory damages within the meaning of 42 U.S.C. § 1981a but a form of equitable relief authorized by 42 U.S.C. § 2000e–5(g)); see also Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73 (3d Cir. 2009) (addressing back pay and front pay under Title VII).

At the time of the pretrial conference, the undersigned provided notice to the parties that all facts in this case will be tried to a jury, even though their

---

[3] Under the Civil Rights Act of 1991, Grant enjoys the right to recover compensatory and punitive damages for certain violations of the ADA and Title VII. 42 U.S.C. § 1981a(a)(1)–(2). According to the text of the statute, compensatory damages include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses[.]" See 42 U.S.C. § 1981a(b)(3). Compensatory damages do not include back pay, interest on back pay, or any other type of relief authorized by 42 U.S.C. § 2000e– 5(g). 42 U.S.C. §1981a(b)(2). Grant may recover punitive damages if she demonstrates that the defendants engaged in discriminatory practices "with malice or indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1).

9

determinations relative to back pay and front pay would only supply an advisory opinion. See Fed. R. Civ. P. 39(c)(2); Donlin, 581 F.3d at 78 n.1. Consequently, evidence related to all of Grant's alleged damages are presumed to be relevant and admissible at trial. See Fed. R. Evid. 401, 402.

Regarding such damages, "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). ADA and Title VII claimants thus have a statutory duty to mitigate damages. See Booker v. Taylor Milk Co., 64 F.3d 860, 864 (3d Cir. 1995); 42 U.S.C. § 12117. A plaintiff's failure to mitigate her damages "should be used to *reduce or decrease* a back pay award, not to wholly cut off the right to any back pay." Booker, 64 F.3d at 866 (citations omitted) (emphasis in original).

Although the statutory duty to mitigate damages is placed on the plaintiff, the employer has the burden of proving a failure to mitigate as an affirmative defense. Robinson v. Se. Pennsylvania Transp. Auth., Red Arrow Div., 982 F.2d 892, 897 (3d Cir. 1993). To reduce any potential back pay award in this case, defendants must demonstrate that: 1) substantially equivalent work was available; and 2) the claimant did not exercise reasonable diligence to obtain employment. Booker, 64 F.3d at 864.

Grant's motion in limine argues that defendants cannot succeed on their failure-to-mitigate affirmative defense as a matter of law. (Doc. 39 at 3–5).  To that end, plaintiff contends that defendants failed to identify that a "substantially equivalent" position was available during the pretrial discovery period. Id. at 3–4. As for the "reasonable diligence" element, plaintiff asserts that she applied for approximately 400 jobs after the defendants terminated her.  Id.

Defendants counter that Grant really seeks summary judgment on this affirmative defense and that it would be improper to remove consideration of plaintiff's mitigation efforts from the factfinder at this juncture. (Doc. 42 at 3–6).

The court agrees with the defendants on this point.  Grant's motion in limine plainly seeks to eliminate a fact-intensive issue as a matter of law. See Booker, 64 F.3d at 864 ("Whether or not a claimant has met [her] duty to mitigate damages is a determination of fact[.]").  Procedurally, this motion would have been best advanced by a motion for summary judgment.  FED. R. CIV. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense…on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); see also Bradley, 913 F.2d at 1069; Bowersox v. Dep't of Corr., No. 4:18-CV-00384, 2021 WL 12313053, at *5 (M.D. Pa. Dec. 28, 2021) (Wilson, J.) (determining that a

similar motion *in limine* to preclude a failure-to-mitigate defense was "more akin to a late-filed summary judgment motion"). Additionally, if plaintiff presented the instant motion in limine as a motion for summary judgment, she would have violated numerous procedural rules, particularly by failing to cite "particular parts of the record" as required by Rule 56(c).[4] See Fed. R. Civ. P. 56(c)(1). Based on plaintiff's failure to support her motion with evidence from the pretrial record, the court will not entertain issue-dispositive arguments made in conjunction with the motion in limine.

In the alternative, Grant asserts that the probative value of failure-to-mitigate evidence is substantially outweighed by the risk of unfair prejudice or confusion of the issues. (Doc. 39 at 5–6). Specifically, plaintiff argues that it would be unfairly prejudicial for defendants to introduce evidence as to why "she would not accept the fire extinguisher job." Id. at 6.

Generally, relevant evidence is admissible at trial. FED. R. EVID. 402. Evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. The court may

---

[4] Although the court is not prohibited from granting summary judgment upon consideration of a pretrial motion in limine, notice and a reasonable time to respond must be provided to the defendants. See Forrest, 930 F.3d at 111 (citing FED. R. CIV. P. 56(f)) (additional citations omitted). At no time has the court provided notice to the defendants that it would consider Grant's motion as a motion for summary judgment.

preclude relevant evidence where its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

As indicated above, Grant did not support her motion with any portion of the pretrial record. Nonetheless, plaintiff's motion in limine contains references to her deposition testimony without citation to the record. (Doc. 39 at 4 n.1, 6). Thus, to have some familiarity with plaintiff's testimony, the court ordered that her deposition be filed prior to oral argument. (Doc. 66). Even still, a review of that transcript does not permit the court to make any definitive evidentiary rulings prior to trial.

According to the information available to the court at this time, Grant served as the "Head of DC Sales, Associate Publisher" with *The Hill* prior to her termination on July 22, 2022. (Doc. 60 ¶¶ 5, 11). In her deposition, Grant explained that her position with defendants involved advertising sales for print, digital, and video products offered by the publication. (Doc. 66 at 27). Grant also sold advertising and sponsorships to live events produced by the publication. Id. at 28–29. At the time of her termination in July 2022, plaintiff supervised approximately 15 employees involved in ad sales. Id. at 34-38.

According to Grant's testimony, following her termination by defendants, she obtained employment with *Sports Illustrated* in November 2022 before being laid off in July 2023. Id. at 12–13.  In her position with *Sports Illustrated*, plaintiff also worked in a sales function. Id. at 12.  Grant testified that her subsequent position paid $50,000 less in salary than her position with the defendants and involved a "significant cut in commission opportunity[.]" Id. at 264.  However, the full details of plaintiffs' compensation at *The Hill* and *Sports Illustrated* are not of record.

As she testified, Grant was then unemployed from July 2023 until at least October 2024 when she was deposed in this case. Id.  Plaintiff explained that she had applied for over 100 jobs after being laid off from *Sports Illustrated*. Id. at 18.  Some applications led to interviews, but none had resulted in an offer at the time of her deposition, some fifteen months later.  Id. at 16-17.

Grant also testified in her deposition that publishing-related media jobs like the one she held with *The Hill* were not readily available due to structural changes and acquisitions in the industry. Id. at 20–21.  In turn, the defendants explored some of the non-media sales jobs that plaintiff applied for, but did not pursue.  Specifically, defendants confronted Grant with emails during her deposition where she expressed disinterest in open positions with Cintas and the Pittsburgh Penguins. (Doc. 66 at 253–66).  Plaintiff explained that she did not

move forward with the Penguins position due to health concerns working in an arena setting and because the salary and commission potentials were not commensurate with her experience. Id. at 255–59.  Similarly, Grant explained that the position with Cintas involved a much lower salary, travel requirements, and selling fire extinguishers, which were not aligned with her skills and experience. Id. at 262–263.

Regarding the overall relevance of the Pittsburgh Penguins and Cintas positions, there are two mitigation-related duties referenced in Booker. 64 F.3d at 866 (citing Ford Motor Co. v. E. E. O. C., 458 U.S. 219, 231 (1982); Tubari Ltd., Inc. v. N.L.R.B., 959 F.2d 451, 458 (3d Cir. 1992)).  First, "[a]lthough the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, [she] forfeits [her] right to backpay if [she] refuses a job substantially equivalent to the one [she] was denied." Ford Motor Co., 458 U.S. at 231–32 (1982) (citing NLRB v. Madison Courier Inc., 472 F.2d 1307, 1318 (D.C. Cir. 1972) ("Madison Courier I").  Second, there is a "lower sights" corollary to the mitigation doctrine, where "a discriminatee is required to 'lower [her] sights' by seeking less remunerative work" after "unsuccessfully attempting for a reasonable period of time to secure substantially equivalent interim employment[.]" Tubari Ltd., Inc., 959 F.2d at 456 (3d Cir. 1992) (citing Madison Courier I, 472 F.2d at 1318).  As the record

available to the court now stands, Grant was only deposed about the details of the Pittsburgh Penguins and Cintas "lower sights" positions and not others, such as where her applications proceeded to interviews.  Grant has also not been cross-examined at trial regarding her statements, in essence, that substantially equivalent work was not available in her field for people with her experience. The court cannot rule out that defendants will be able to confront Grant at trial with evidence to the contrary.

Consequently, the court needs more information before precluding potentially relevant mitigation evidence.  A final decision with respect to the Pittsburgh Penguins and Cintas positions is best reserved for trial, such as after plaintiff provides more-specific evidence and testimony supporting her claim for back pay and front pay damages, i.e., her salary, commission structure, earnings, job responsibilities, and potential for advancement in her positions at *The Hill* and *Sports Illustrated* as well as any position she may have obtained after her deposition in this case.  See Walden v. Georgia-Pac. Corp., 126 F.3d 506, 518 n.10 (3d Cir. 1997) (noting that the exclusion of evidence on prejudice grounds "should rarely be made in limine" because Rule 403 is "a trial-oriented rule.").  That evidence would aid in understanding the "substantially similar" component of the asserted failure-to-mitigate defense in this case. See Booker, 64 F.3d at 864.  A decision is also best reserved for after plaintiff testifies about

further details of her job searches, particularly after being laid off from the lower-paying position at *Sports Illustrated*.  That evidence would aid in understanding the "reasonable diligence" component of the asserted failure-to-mitigate defense. Id.  Additionally, plaintiff's job search testimony at trial will aid the court in determining whether the "lower sights" doctrine is applicable to this case and, if so, to what extent. see also Tubari, Ltd., Inc. 959 F.2d at 456 (noting "the tension between a discriminatee's duty to seek substantially equivalent interim employment and the subsequent duty to lower his or her sights after a 'reasonable' period of time").

Grant's motion in limine will thus be denied without prejudice.  At trial, defendants may elicit testimony and present evidence as to whether plaintiff used reasonable diligence to obtain a substantially similar position.  The court will reconsider the prejudice arguments made by plaintiff in her motion in limine if properly raised by objection in the trial context.

### 2. Defendants' Motions in Limine

Defendants also filed several motions in limine in accordance with the court's orders.  Specifically, defendants seek to preclude: 1) lay opinion testimony from Emily Anderson about other employee complaints against Wil Danielson, (Doc. 36); 2) "me too" evidence, (Doc. 38); and 3) evidence of

disciplinary recommendations made regarding Danielson, (Doc. 40).  All of these motions refer to or implicate Anderson's deposition testimony.

At pretrial conferences in this matter, plaintiff indicated that Anderson will be the only HR witness called in their case in chief and will be called to discuss Danielson's own personnel issues.  Plaintiff has indicated that Anderson is unavailable to testify at trial due to the limitations of Federal Rule of Civil Procedure 45(c)(1)(A).  To that end, plaintiff has identified portions of Anderson's deposition testimony that she intends read to the jury under Rule 32(a)(1). (Doc. 69).  Defendants have responded with objections to those designations, (Doc. 71), and plaintiff, in turn, has responded, (Doc. 72).

During Anderson's deposition, she testified that, although she was aware of Grant's discrimination complaints, she was not involved in a company investigation into those complaints.[5] (Doc. 65 at 19–25, 39-41).   Anderson also testified that she was not involved in the decision to place plaintiff on a PIP in lieu of conditional resignation or the decision to terminate the plaintiff's employment. Id. at 29–31, 39–41.

---

[5] Like plaintiff, defendants did not supply a record to consider along with their motions in limine.  The court thus directed defendants to supply Anderson's deposition transcript by way of an order dated October 31, 2025. (Doc. 64).

Nonetheless, Anderson testified that she was familiar with seven other employee complaints against Wil Danielson, plaintiff's supervisor. Id. at 32–39, 41–44, 55–56. Regarding five of those complaints, Anderson concluded *personally* that Danielson engaged in dishonesty. Id. In two of those complaints, Anderson concluded that Danielson retaliated against the employees for reaching out to HR. Id. at 48–49. As for Anderson's specific level of company authority, she testified that "she did not have the final conclusion to the investigation[s]." Id. at 42.

Anderson further testified that defendants issued a written warning to Danielson as the result of one of the complaints. Id. at 46. Anderson also made a recommendation to her two HR supervisors that Danielson be terminated based on the investigations into the above-referenced complaints. Id. at 46–47. According to Anderson, her supervisors agreed with that recommendation and proposed its implementation in some way. Id.

Anderson further testified that defendants did not terminate Danielson based on the recommendation from HR. Id. at 50–51. Rather, according to Anderson, the defendants removed Danielson from a managerial role and made him an individual contributor to company revenues. Id. at 52. Anderson had no knowledge of the individuals who decided to keep Danielson with the company. Id. at 52–55. According to Anderson, the events regarding an HR

19

recommendation to terminate Danielson all occurred in the autumn of 2022, after Grant's termination.  Id. at 50.

Defendants seek to preclude Anderson's lay opinion testimony regarding other employee complaints about Wil Danielson.  (Doc. 36).  Specifically, Anderson personally concluded that Danielson acted in a dishonest and retaliatory manner regarding these other employees. Anderson also testified that she made a recommendation to terminate Danielson based on her conclusions related to these other employees' complaints and that her HR supervisors shared this view.

Defendants contend that such testimony provides improper lay opinions in violation of Federal Rule of Evidence 701.  Defendants further assert that such testimony is inadmissible character/propensity evidence under Rule 404. Additionally, defendants argue such testimony is unduly prejudicial under Rule 403.  As indicated above, defendants also provided objections to Anderson's deposition testimony as designated by plaintiff for trial. (Doc. 71).  Plaintiffs, in turn, filed a response to those objections. (Doc. 72).[6]

---

[6] To the extent that plaintiff argues that defendants waived all objections to Anderson's testimony "except those to 'relevancy and materiality' by failing to object contemporaneously during the deposition," (Doc. 73 at 6), the Federal Rules of Civil Procedure provide that "an objection may be made at a hearing or trial to the admission of any deposition testimony that would be inadmissible if the witness were present and testifying." Fed. R. Civ. P. 32(b). Defendants thus have not waived any objections to Anderson's testimony.

Turning to the Federal Rules of Evidence, a lay witness opinion is permissible if that opinion is "limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701.

Regarding Rule 701(a), a lay witness is permitted to offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived. Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403 (3d Cir. 1980).  "In layman's terms, Rule 701 means that a witness is only permitted to give her opinion or interpretation of an event when she has some personal knowledge of that incident." United States v. Fulton, 837 F.3d 281, 291 (3d Cir. 2016).

Anderson's deposition testimony does not provide clarity as to how she obtained information about the other complaints against Danielson.  Without such information, the court cannot infer that she received those complaints directly or was assigned to directly investigate these complaints by her HR supervisors. The foundational questions asked during Anderson's deposition, or lack thereof, make it difficult to determine whether the other complaints against Danielson were within the realm of her personal knowledge as the result of investigations that she herself conducted or things that she heard about from other individuals in HR.  Instead, Anderson only made clear that her opinions carried the weight of

21

someone who did not make a final conclusion in any of the investigations into Danielson. (Doc. 65 at 42).

"The proponent of the lay opinion testimony bears the burden of demonstrating an adequate foundation." United States v. Diaz, 951 F.3d 148, 156 (3d Cir. 2020) (citing Fulton, 837 F.3d at 291). Plaintiff has not done so here. The record surrounding Anderson's opinions is insufficient.

The lack of foundation in Anderson's opinion testimony impacts the court's consideration of Rule 701(b), the helpfulness requirement. Rule 701(b) "requires courts to exclude 'testimony where the witness is no better suited than the jury to make the judgment at issue.' " Id. (quoting United States v. Jackson, 849 F.3d 540, 544 (3d Cir. 2017)). Rule 701 also seeks to protect against testimony that usurps the jury's role as fact finder. Fulton, 837 F.3d at 291. "While opinion testimony that embraces an ultimate issue to be decided by the trier of fact is not *per se* inadmissible, such testimony is barred when its primary value is to dictate a certain conclusion." Id. (citations and internal quotation marks omitted).

Here, the primary value of Anderson's underdeveloped opinion testimony would be to dictate certain conclusions to the fact-finder. That is, since plaintiff complained about Danielson and was then terminated, he lied about the plaintiff and retaliated against her like he did with other employees in accordance with Anderson's opinions. Such testimony is unhelpful under Rule 701(b).

Such testimony is also inadmissible under Rule 404.  That rule implicates the admissibility of character evidence and evidence of a person's crimes, wrongs, or other acts.  Pursuant to Rule 404(a), "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." FED. R. EVID. 404(a)(1).  Pursuant to Rule 404(b), "[e]vidence of any other…wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1).  "Rule 404(b) thus prohibits the admission of other acts evidence for the purpose of showing that an individual has a propensity or disposition to act in a particular manner." Ansell v. Green Acres Contracting Co., 347 F.3d 515, 520 (3d Cir. 2003) (citation omitted).  Such evidence may be admitted "if offered for a proper purpose apart from showing that the individual is a person of a certain character." Id.  Other acts evidence "may be admissible for another purpose, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2) (emphasis added).

Rule 404(b) is generally a rule of exclusion. United States v. Brown, 765 F.3d 278, 291 (3d Cir. 2014) (citing United States v. Caldwell, 760 F.3d 267, 275 (3d Cir. 2014).   The proponent of "other wrongs" evidence bears the burden of

23

demonstrating the applicability of Rule 404(b)(2) to make such evidence admissible. See id.  A four-part test governs the admissibility of other acts, under which the evidence must be: (1) offered for a proper purpose under Rule 404(b); (2) relevant to such purpose; (3) not so prejudicial to substantially outweigh the probative value; and (4) accompanied by a limiting instruction, if requested. See Huddleston v. United States, 485 U.S. 681, 691 (1988); United States v. Davis, 726 F.3d 434, 441 (3d Cir. 2013).

As for proper purpose, Grant argues:

> Evidence pertaining to the allegations against Mr. Danielson and, even more critically, Defendants' decision to disregard HR's termination recommendation because he makes "a lot of money" for the company are being offered for the proper purpose of establishing Mr. Danielson and Defendants' discriminatory and retaliatory motives, intent, pretext, and lack of mistake.

(Doc. 46 at 4).

Under the law, "[e]vidence of an employer's conduct towards other employees has long been held relevant and admissible to show that an employer's proffered justification is pretext." Ansell v. Green Acres Contracting Co., 347 F.3d 515, at 521 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804(1973)).  "Thus, other acts are admissible under Rule 404(b) in the employment discrimination context for the proper purpose of establishing… discriminatory intent." Id.

24

At the same time, however, the trial court "must be able to articulate a way in which the tendered evidence logically tends to establish or refute a material fact in issue, and that chain of logic must include no link involving an inference that a bad person is disposed to do bad acts." Id. at 520–21 (citations and quotation marks omitted).  And once the proponent identifies a non-propensity purpose that is at issue in the case, the proponent must demonstrate that the evidence proves something other than propensity. See Caldwell, 760 F.3d at 276.

To date, plaintiff has not supplied a chain of logic connecting the other complaints about Danielson to a proper purpose without one of those links being a forbidden propensity inference.  Rather, the only reasons that these other acts have been presented as relevant to intent, motive, or lack of mistake, are for inferences that because Danielson acted dishonestly and in a retaliatory manner with other employees, he was dishonest and retaliatory with respect to the plaintiff.[7]

---

[7] To the extent that Anderson's testimony about Danielson's dishonesty implicates Rule 608(a) or Rule 608(b), the form of her testimony prevents its use as an admissible form of character evidence. See FED. R. CIV. P. 404(a)(3), 608.   Under Rule 608(a), "[a] witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." FED. R. CIV. P. 608(a). Yet, Anderson's opinion testimony about Danielson's untruthfulness only relates to specific instances of conduct, i.e., the complaints against him by other employees.  Under Rule 608(b), "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." FED. R. CIV.  P. 608(b).

To be admissible, other acts evidence "must have a nonpropensity purpose *and* satisfy the same relevancy requirements as any other evidence." United Davis, 726 F.3d at 441 (citations omitted). Thus, the Rule 404(b) analysis also incorporates determinations under Rule 403, a separate grounds for defendants' motion in limine and objections. Pursuant to Rule 403, "the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. CIV. P. 403.

Read to a jury in its existing form, Anderson's deposition testimony poses a serious danger that the jury will confuse the issues and be misled.[8] That danger includes a jury deciding this case on character and propensity evidence from opinions formed by one HR employee with limited authority, which are derived from her unclear role in internal investigations that did not involve the plaintiff or

---

[8] The form of Anderson's deposition testimony also supports a finding that unfair prejudice outweighs its probative value regarding the witness's conclusions. Specifically, the words "dishonest" or "dishonesty" were introduced by counsel into many of the questions concerning other complaints. That front-loading style of examination continued into questions about Anderson's personal conclusions about Danielson's honesty and the reasons she recommended that he be terminated. (See Doc. 65 at 34 (Duggan complaint), 35 (Velin complaint), 37 (Marrett complaint), 38 (Gingold and Montoya complaints), 41 (asking Anderson about her conclusions about whether Danielson "had indeed engaged in some type of either improper or dishonest conduct"), 43 (Marrett conclusion), 44 (Montoya conclusion), 49, 56 (Ricci complaint)).

any allegations of sex and disability discrimination.  Consequently, for the reasons set forth above, defendants' motion in limine to preclude the lay opinion testimony of Emily Anderson, (Doc. 36), will be granted.

The above analysis also applies to the "me too" motion in limine filed by the defendants, (Doc. 38), since it appears that Grant would only be exploring other complaints against Danielson through Anderson's testimony.  Similarly, defendants' motion in limine to preclude evidence of disciplinary recommendations made regarding Wil Danielson is premised upon Anderson's testimony. (Doc. 40 at 2).  After review of Anderson's testimony with respect to this issue, the questions and answers dealing with these disciplinary recommendations all stem from or reference the investigations into other employees and the opinion testimony that is being precluded.  Moreover, Anderson's answers to questions about why defendants did not terminate Danielson demonstrate that this area was outside of the witness's scope of knowledge based on her role in HR and that her knowledge was informed entirely by hearsay.   Thus, defendants' other motions in limine concerning Anderson's testimony will also be granted.

**Conclusion**

For the reasons set forth above, plaintiff's motion in limine to preclude a failure-to-mitigate defense, (Doc. 39), will be denied without prejudice.  The court

will consider any Rule 403 arguments made by plaintiff in her motion in limine if properly raised by objection in the trial context.

Defendants' remaining motions in limine, (Docs. 36, 38, 40), will be granted.

An appropriate order follows.

Date: **11/14/25**

JUDGE JULIA K. MUNLEY
**United States District Court**