**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRITTANY GRANT,** <br> **Plaintiff** <br><br> **v.** <br><br> **NEXSTAR MEDIA GROUP, INC. d/b/a The Hill; NEXSTAR MEDIA, INC. d/b/a The Hill; and CAPITOL HILL PUBLISHING CORP. d/b/a The Hill,** <br> **Defendants** | : | **No. 4:23cv1932** <br><br> **(Judge Munley)** |

FILED
SCRANTON
AUG 24 2026
PER DJ
DEPUTY CLERK

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**MEMORANDUM**

Plaintiff Brittany Grant filed this action against entities of her former employer, Defendants Nexstar Media Group, Inc., Nexstar Media, Inc., and Capitol Hill Publishing Corp., all doing business as *The Hill*, (collectively "Nexstar"). Nexstar terminated the plaintiff. Before terminating her, Nexstar placed her on a performance improvement plan, or PIP.

Grant contended that those employment decisions were discriminatory and retaliatory. Her complaint asserted claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.,* the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12117 and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. §§ 951–963.[1] (Doc. 1). In November 2025, after a

[1] The court has jurisdiction under 28 U.S.C. § 1331 and § 1367(a).

four-day trial, a jury deliberated and unanimously returned a verdict in favor of Nexstar and against Grant.

Before the court is the plaintiff's timely-filed motion for judgment as a matter of law, or, in the alternative, motion for a new trial. (Doc. 95). For the reasons set forth below, the motions will be denied.

## I. Motion for Judgment as a Matter of Law

Grant renews her motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). "Entry of judgment as a matter of law is a 'sparingly' invoked remedy[,]" Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007), that should be "granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). Following a jury trial, the court may grant a motion for judgment as matter of law "only 'if upon review of the record, it can be said as a matter of law that the verdict is not supported by legally sufficient evidence.'" Rodriquez v. Se. Pa. Transp. Auth., 119 F.4th 296, 298 (3d Cir. 2024) (quoting Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 691–92 (3d Cir. 1993); see also Fed. R. Civ. P. 50(a). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is

evidence upon which the jury could properly find a verdict for that party." Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993) (quoting Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978)).

In this matter, there was sufficient evidence for a reasonable jury to have found in Nexstar's favor. As the trial record reflects, Brittany Grant was hired by a political publication, *The Hill*, in 2015 as an account executive in advertising sales. (Doc. 87, Day 1 Tr. 51:18–52:13). She was promoted to director of business development in 2019. Id., 52:14-20.

Around the time of her promotion and just days after her 30th birthday, Grant was diagnosed with Stage 4 chronic kidney disease, which progressed to end-stage renal failure. Id., 53:5–54:17. On March 9, 2020, just prior to COVID-19 shut-downs, the plaintiff underwent a kidney transplant. Id., 55:3-15.

Grant returned to work after three months of recuperation, but outside the Beltway. Id., 55:16–21. That is, she worked remotely from her family hunting camp north of Williamsport, Pennsylvania due to the pandemic and her post-transplant medical treatment. Id., 55:11-15, 56:16–57:18. Shortly thereafter, in September 2020, Grant was promoted to head of D.C. sales and associate publisher. Id., 57:22–58:8.

Grant remained in that position when Nexstar acquired *The Hill* in 2021. Id., 60:5-14. After the acquisition, in or around December 2021, Grant began

reporting to individuals within Nexstar's leadership structure, first Lori Tavoularis and then to Wil Danielson, who reported to Tavoularis. Nexstar also hired a general manager for *The Hill*, Jason Jedlinski. Grant did not report directly to Jedlinski.

According to Grant's testimony, she disclosed her medical status to Tavoularis shortly after the acquisition when she made inquiries related to her health insurance transitioning. Id., 61:11-25. Per plaintiff, Tavoularis passed along that information to Karen Brophy, the president of Nexstar Digital. Id. Grant also emailed a regional human resources manager in December 2021 disclosing that she was a donor kidney recipient. Id., 63:13–64:19. Danielson, her first-line supervisor, was copied on that email. Id. Additionally, Grant disclosed to Jedlinski, *The Hill*'s GM, that she had received a donor kidney during their introductory one-on-one meeting in December 2021. Id., 64:20–66:6.

Grant's performance under the new leadership structure was a point of contention during trial. Nexstar centered its defense on such performance while also emphasizing that the plaintiff failed to improve her communications with Jedlinski and members of her sales team.

**A. Grant's Email Exchange with Jason Jedlinski in December 2021**

According to Grant, she used her allotted paid time off ("PTO") at the end of 2021 and that leave was approved by Nexstar. Id., 66:7-68:1. Jedlinski,

however, expected Grant to continue working while on PTO. That is, on December 27, 2021 at approximately 5:00 PM, Jedlinski emailed Grant requesting that she add information into a spreadsheet so that Jedlinski could send introductory emails to the heads of public affairs at numerous corporations. Id., 68:2-71:13. Per the plaintiff's testimony, it "was a giant spreadsheet with probably over a thousand lines in it, [and] an extensive number of columns." Id. She testified further: "He wanted me to review the information and add in contact details and/or information about how, as a company and our team, have we interacted with all of these people for him to then send an email to all of them introducing himself." Id., 68:9-17

Then, in approximately a ten-minute span, Grant responded by email, advising Jedlinski that she was out of the office until the new year. Id., 68:18–69:1. Jedlinski pressed. Id., 69:2-8. Grant replied: "Not tonight, but I guess I will have to do it tomorrow. I was really hoping to use my time off to be off." Id., 69:9-12. Jedlinski continued to press. He responded:

> I understand and I do respect vacations and time off. Since you told me there are potential leads you'd rather I not contact, I'm asking you to flag which companies you want me to skip. I cannot imagine that taking more than 10 minutes of your day and proactively crossing off anyone I know to be a *Hill* client and anyone who is connected to your reps on LinkedIn. I shared this list with you last Tuesday, and you could have noted rows you wanted me to skip before your vacation.

Id., 69:13-21.

Grant testified that the request was not a ten-minute request, but a task that would have taken more than an hour to create "a good final product, not something that was just half-baked." Id. 69:22–70:7.

She sent a reply email approximately an hour-and-a-half later. Id., 70:12–71:7. In that email, Grant disclosed that she had been at the hospital since early that morning and was scheduled for a round of treatments the next day. Id., 70:12–71:7. She referred to the "10 minutes of your day" portion of Jedlinski's previous email as "slighting and condescending[.]" Additionally, despite her testimony that she wanted to supply something that was not "half-baked," Grant wrote: "[N]evertheless, I've completed this at a quick glance and hope it's helpful to you during your test send." Id. Further, she wrote: "Upon my return, we can discuss how to get you introduced to the rest of our clients that we have close relationships. I have zero interest in going tit for tat with you via email and, again, find this time to be completely unproductive." Id. Plaintiff continued: "I'm trying to give you the benefit of the doubt, but not sure how else to read this. What you shared with me Tuesday was nascent in comparison." Id. She concluded: "Your genuine efforts are appreciated, but in the future, I need more lead time or a clear date that you intend on doing this so I can more effectively

manage my work load to be sure that your requests are prioritized. Enjoy your evening." Id.

Jedlinski responded: "I saw that you quickly flagged the companies you want to discuss before I approach, that's all I was seeking to proceed this week. Thank you. The aim of my reply was not to be slighting or condescending, let's continue our conversation when you're back next week. Hope your treatments go smoothly." Id., 71:8-13.

It is undisputed that Grant's working relationship with Jedlinski never improved. On the stand, Grant's immediate supervisor Wil Danielson remarked on the plaintiff and Jedlinski lobbing "virtual grenades at each other" during Zoom meetings. (Doc. 86, Day 2 Tr., 22:9–18, 83:9–84:6). He testified that the situation between the two required him and Lori Tavoularis to take time away from their work "to get both of them to, like, sit in their separate corners and realize they need to play nicely, because they're supposed to be partners in the way that we grow the business together." Id. 82:22–83:8. Similarly, Tavoularis testified that Grant and Jedlinski were involved in constant battles. (Doc. 100-1, Tavoularis Tr. 42:14-18).

In February 2022, Jedlinski complained to Tavoularis about Grant by email, referring to plaintiff's performance as a "business risk" and expressing concerns that first quarter revenue goals would not be met. (Doc. 87, Day 1 Tr., Pl.

Testimony 74:22–75:6). Jedlinski also accused Grant of leaking proprietary information to *The Hill*'s former owners. Id. 76:7-17. Four days after that email, Grant emailed Tavoularis with complaints about Jedlinski and expressed concerns that he would cause her to miss her quotas and budget. Id., 79:16–84:22. The evidentiary record contains other emails where Jedlinski pressed for plaintiff's termination during the first half of 2022, including shortly after plaintiff experienced two hospitalizations. Id., 95:4–96:15.

Specifically, on March 9, 2022, Grant celebrated two years post-transplant. Id. 85:4-23. Toward the end of the month, plaintiff suffered from a severe kidney infection, which required hospitalization and missed time from work between March 31, 2022 to April 4, 2022. Id. 85:24:86:7. On April 14, 2022, Grant experienced another infection related to her kidney transplant, which resulted in rehospitalization. Id., 86:22–88:7. From April 14, 2022 to April 21, 2022, plaintiff required additional time from work to care for her medical needs. Id. Tavoularis testified that Grant used PTO for those absences, not medical leave approved through human resources. (Doc. 100-1, 46:20–47:18).

**B. Grant's Performance**

Grant's underperformance was Nexstar's proffered reason for placing her on a performance improvement plan and for her eventual termination. Nexstar witnesses offered varying testimony about Grant's performance.

Specifically, Lori Tavoularis, Grant's second-level supervisor, testified that that the plaintiff was forecasted to hit her first quarter quota as of February 21, 2022. Id. 40:6-20. On the other hand, Tavoularis also testified:

> Q Outside of the tension between Mr. Jedlinski and Ms. Grant, what was Ms. Grant's performance like on the job during this period of time? And, again, I'm talking about early 2022.
>
> A Sure. Her performance started to decrease. She had lost a large account. There was a lot of blaming of Jason [Jedlinski] on why things were not going well for her. She had some issues with her team. There was -- I believe it was Monica [Seebohm] on her team had performance issues. She wasn't willing to address the performance issues to the standard that we would think that a leader would.
>
> She wanted [Seebohm] put on a PIP, and she asked Wil [Danielson] to do it for her. There were a lot of instances of just not what we would consider taking that leadership role. She also didn't like talking about performance being bad and felt like it was bad for morale for the team, which was in conflict of how we would manage it. We think it's really important to be transparent so that we could solve the problems.

Id. 12:12–13:6

Danielson contradicted some, but not all, of Tavoularis's testimony. He disagreed that Grant was on target to hit her first quarter quota. (Doc. 88, Day 2 Tr. 31:9-17). He indicated that the plaintiff's sales team was double-digit figures behind their quotas and that "sales numbers were a problem the entire first and second quarter." Id., 32:10-19, 49:24–50:2. According to Danielson's testimony,

he discussed Grant's performance issues with her weekly. Id., 85:8-25. Danielson testified: "It was frustrating, week after week, to get the same story without different results or different effort." Id.

As for Grant's interpersonal communication and management of her sales team, Danielson testified that the plaintiff experienced further issues. As an example, Danielson testified that the plaintiff was not managing certain people at all. Id. 88:17-20. Per Danielson, plaintiff refused to deliver a performance improvement plan, a PIP, to a member of her sales team, Monica Seebohm, after that individual did not achieve her financial targets. Id., 88:21–89:24. Instead, Danielson took on a greater role managing this member of Grant's team after she refused to deliver the PIP and contacted human resources to raise her concerns about doing so. Id.; see also 103:9–106:24. In April 2022, Grant also told Danielson that he could not join one of her sales meetings to discuss her team's performance. Id., 96:18–101:4. At that time, Danielson advised Grant that *The Hill* was 54% under its forecasted budget and at negative 40% in revenue from the prior April. Id. Per Danielson, he believed *The Hill* was probably spending more money than it was making at that time. Id.

As for the plaintiff's use of PTO in March and April 2022 due to medical treatment, Danielson testified that her sales goals were not adjusted because she took days off in a non-consecutive manner, which people did frequently. Id.

49:1-23. Danielson also testified that he covered for Grant and completed her work during her absences. Id. 95:1-11.

Danielson further testified that another employee, Mark Wildman, had his entire sales team fired for non-performance in the first quarter. Id., 54:25–54:11. According to Danielson, Wildman was not placed on a PIP and terminated like Grant because he met his individual quota and was able to obtain "Google or YouTube or one of those big accounts for a couple million dollars[.]" Id., 54:15–55:7; see also 102:11-16. Danielson confirmed that Wildman eventually took over Grant's team. Id. 145:12-21.

**C. The Performance Improvement Plan and Grant's Termination**

Danielson testified that as of Friday, April 22, 2022, a decision was made by Karen Brophy to terminate the plaintiff. Id., 55:8–57:16. Brophy was the president of Nexstar Digital. According to Danielson, management would have a financial meeting on Fridays and there were multiple weeks of *The Hill* underperforming. Id. Per Danielson, Brophy asked specifically about Grant's revenue and interpersonal issues and sought input from Danielson, Tavoularis, and Jedlinski on the decision. Id., 57:21–59:4.

Danielson was tasked with administering the decision. Per Danielson, a determination to offer Grant options occurred during his discussions with Terri Bush, Nexstar's Senior Vice-President of Human Resources. Id., 61:2–62:9.

Those options were a severance package for resignation or a performance improvement plan. Id.

Brophy also testified in this matter. According to Brophy, she had to report financial information to Nexstar's founder, Perry Sook, and the rest of the board of directors each quarter. Id., 141:14–142:11. Brophy explained that she was not seeing sales results from Grant's team, which compounded financial goals not being met. Id., 142:12–143:3. Brophy then applied downward pressure on Tavoularis and Danielson to fix the issues and show success. Id., 143:4–145:25.

Brophy further testified that she observed an illuminating meeting with Grant after identifying the financial issues on her team. Id. 145:10–146:4. Brophy explained:

> I had sat in on a meeting with [the plaintiff], and it was clear, from her attitude, that she was unhappy. She wasn't disrespectful, but she was cold, and, you know, very different than the first time I had met her. So I just knew that, you know, she was unhappy and becoming disengaged. So I started saying, I think, we need to either see if she wants to stay with us or if we need to do a plan to get things back on track.

Id. 145:23–146:4.

Per Brophy, she decided to issue the PIP, which Grant accepted. Brophy explained that she observed limited changes in plaintiff's performance after the

PIP was issued and decided to terminate Grant amidst the pressure to improve the numbers at *The Hill*. Id., 148:24–150:15.

Brophy also testified as follows:

> Q. So as of April 26, 2022, you wanted Ms. Grant to be on a PIP?
>
> A. I wanted her to either -- if she was unhappy enough to leave, we wanted to help her leave, and if she was willing to do a PIP and stay and work with us, I was happy to try to help her improve her performance.

Id. 156:5-10.

Brophy implied in her testimony that plaintiff's time off in April 2022 for medical reasons would not have had a meaningful effect given how far away plaintiff's team was from meeting their numbers. Id., 158:8-16.

**D. Plaintiff's Circumstantial Evidence of Discrimination and Retaliation**

Grant's claims of disability discrimination focused on the timeline of Nexstar's decision-making and the inconsistencies in witness testimony against the emails. She highlighted that Nexstar's decision to terminate her appeared solidified in April 2022 just days after she returned from her time off for medical treatment. Grant's claims of sex discrimination focused on Jedlinski's conduct and evidence that a peer, Mark Wildman, was not placed on a PIP and terminated due to his team's poor performance. She emphasized that Wildman received her clients and commissions when she was fired. Similarly, Grant's

retaliation claims focused on the suspicious timing of her PIP and termination relative to her formal and informal complaints of discrimination, which included e-mails to her supervisors about Jedlinski's conduct. Ultimately, however, a jury credited the testimony of Danielson, Tavoularis, Brophy, or some combination of the three, that Nexstar took adverse employment action against the plaintiff due to her performance.[2] Such testimony sufficiently supports the verdict in this case.

## II. Motion for a New Trial

In the alternative, Grant requests a new trial. Under the Federal Rules of Civil Procedure, a court may grant a new trial on all or some issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). Those reasons include a demonstration that the verdict is against the weight of the evidence, that the damages are excessive, or that the trial was unfair or was influenced by prejudicial legal error. Klein v. Hollings, 992 F.2d 1285, 1289–90 (3d Cir. 1993) (citations omitted); Semper v. Santos, 845 F.2d 1233, 1236 (3d Cir. 1988) (citations omitted). A new trial under Federal Rule of Civil Procedure 59 is

---

[2] As Danielson, Tavoularis, and Brophy testified, they all eventually lost their positions with Nexstar. Brophy's contract was not renewed "when [Nexstar] brought in someone that had promised them better money." Id. 150:20-24. Per Brophy, Jedlinski was terminated six months after Grant based on his performance and his management style. Id., 163:24–164:11. Danielson testified that he was terminated at the end of 2024 as part of a reduction in force. Id., 34:13-16. According to Tavoularis's testimony, she was involuntarily separated from Nexstar as part of position elimination. (Doc. 100-1, 23:11-14).

appropriate "when 'the great weight of the evidence cuts against the verdict and . . . a miscarriage of justice would result if the verdict were to stand.'" Leonard v. Stemtech Int'l Inc., 834 F.3d 376, 386 (3d Cir. 2016) (quoting Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006)). There is a high threshold for overturning a jury verdict on a motion for new trial, and it is not crossed where the verdict, as a whole, does not shock the conscience or cry out to be overturned. Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc., 89 F.4th 430, 443 (3d Cir. 2023) (citation and quotation marks omitted). "Where evidence is in conflict and subject to two interpretations, the trial judge should be reluctant to grant a new trial." Klein, 992 F.2d at 1295.

In light of the evidentiary review above, it is clear that the jury's verdict must stand. Thus, to the extent that Grant's motion challenges the weight of the evidence in her pursuit of a new trial, the motion will be denied.

Next, where the motion is grounded in jury instructions or evidentiary rulings, the inquiry is less deferential to the verdict. See Klein, 992 F.2d at 1289–90 ("the district court's latitude on a new trial motion is broad when the reason for interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court, *e.g.* evidentiary rulings[.]"); Foster v. Nat'l Fuel Gas Co., 316 F.3d 424, 429 (3d Cir. 2003) ("Legal error in a charge to the jury may constitute grounds for granting a new trial.").

However, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order." FED. R. CIV. P. 61. "At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Id.

**1. Jury Instructions**

Grant's complaint asserted discrimination claims under Title VII, the ADA, and the PHRA. (Doc. 1, Compl. ¶¶ 111, 117, 123). She also asserted retaliation claims under these statutes. Id. Following the verdict in Nexstar's favor, plaintiff now raises new issues, such as a challenge to the adverse action portion of the retaliation instructions. She also revisits prior challenges to the court's decisions not to read certain requested instructions—a mixed-motive instruction for her disability discrimination claims, a supplemental determinative factor instruction, and an adverse inference instruction.

**a. Retaliation Claims – Adverse Action Instruction**

As her lead legal argument for a new trial, Grant focuses on an omitted reference to the Nexstar-imposed performance improvement plan ("PIP") in the retaliation instructions read to the jury. She asserts that the court "instructed the jury that the only materially adverse action it could consider for [p]laintiff's

retaliation claims was her termination." (Doc. 95, Pl. Br. in Supp at 27). Plaintiff also argues that the court "misstated the law." Id. at 36. Neither of those things occurred.

Under the law, the court has broad discretion in formulating its jury instructions and "[a] party has no vested interest in any particular form of instructions; the language of the charge is for the trial court to determine." James v. Continental Ins. Co., 424 F.2d 1064, 1065 (3d Cir. 1970); see also Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1124 (3d Cir. 1992) ("a trial judge has broad discretion concerning the particular language used in a jury instruction."). Prior to trial, the plaintiff submitted nine proposed jury instructions. (Doc. 55). Five of her proposed instructions referenced her termination—and only her termination—as the adverse action she experienced. Id. at 3, 4–7, 9–10. The plaintiff also submitted a single proposed instruction covering her Title VII, ADA, and PHRA retaliation claims. Id. at 11. That instruction did not include reference to plaintiff's performance improvement plan or her termination, only a vague reference to "Nexstar's actions." Id.

The model retaliation instructions include a bracketed area, "[describe alleged retaliatory activity]." THIRD CIRCUIT COMMITTEE ON MODEL CRIMINAL JURY INSTRUCTIONS §§ 5.1.7, 9.1.7 (2025). Additionally, similar bracketed areas

appear in the model Title VII and ADA disparate treatment instructions. Id., §§ 5.1.2 and 9.1.2 (2025).

The instructions read to the jury hewed closer to the model Title VII and ADA instructions. It is not disputed that Nexstar placed Grant on a performance improvement plan and then terminated her. Plaintiff's closing argument made repeated references to the PIP being discriminatory and retaliatory. (Doc. 91, Day 4 Tr. at 69–71, 74, 76–77). Defendants argued that the adverse employment actions were purely about numbers—"a legitimate performance-based PIP termination." Id. at 91.

The court then referred to these adverse actions in the discrimination instructions as "Nexstar's decisions to place her on a [p]erformance [i]mprovement [p]lan and then terminate her." Id. at 113. The court also instructed: "Nexstar has given non-discriminatory reasons for its actions, that is, Nexstar terminated Plaintiff's employment because of her failure to meet the objectives in her Performance Improvement Plan or PIP." Id. at 117.

The court did not refer to the PIP in its retaliation instructions. Specifically, the instructions read to the jury provided, in relevant part:

> Concerning the second element. The term, materially adverse. That means that Ms. Grant must show that her termination was serious enough that it well might have discouraged a reasonable worker from making complaints of disability and sex discrimination.

> . . .
>
> Ultimately, you must decide whether Ms. Grant's complaints of discrimination and charge of discrimination had a determinative effect on Nexstar's decision to terminate her.
>
> Determinative effect means that, if not for Ms. Grant's complaints of discrimination, the termination would not have occurred.

Id. at 118–19.

At the conclusion of the jury charge, the court provided counsel with an opportunity to be heard on the contents of the instructions:

> Counsel, any additions, corrections or misstatements?
>
> [PLAINTIFF'S COUNSEL]: No, Your Honor.
>
> [DEFENDANTS' COUNSEL]: Perfect from our side, thank you.

Id. at 133.

Plaintiff did not raise any objection to the retaliation instructions read to the jury at that time. Plaintiff also did not object during the charging conference when the court indicated it would not be including reference to the PIP in other instructions. (Doc. 91, Day 4 Tr., at 15–16). In opposing the post-trial motions, defendants contend that the plaintiff has waived any challenge to the retaliation instructions. In the alternative, defendants argue that the omitted reference to

the PIP is not a plain error or an error that affected plaintiff's substantial rights. After review of the trial record, the court agrees with the defendants' positions.

Under the Federal Rules of Civil Procedure, "[a] party may assign as error . . . an error in an instruction actually given, if that party properly objected[.]" FED. R. CIV. P. 51(d)(1)(A). A proper objection is one "on the record, stating distinctly the matter objected to and the grounds for the objection." FED. R. CIV. P. 51(c)(1). "A court may consider a plain error in the instruction that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights." FED. R. CIV. P. 51(d)(2).

Plaintiff did not preserve an objection to the retaliation instruction in the manner contemplated by Rule 51. Therefore, as a general matter, the issue is waived. Alexander v. Riga, 208 F.3d 419, 426 (3d Cir. 2000). Waiver aside, "[a]n error constitutes plain error if: '(1) [the error is] fundamental and highly prejudicial or if the instructions are such that the jury is without adequate guidance on a fundamental question and (2) our failure to consider the error would result in a miscarriage of justice.' " Harvey v. Plains Twp. Police Dep't, 635 F.3d 606, 612 (3d Cir. 2011) (quoting Alexander, 208 F.3d at 426–27) (alteration in original). Furthermore, a single erroneous instruction does not warrant a new trial unless, viewed against the charge as a whole, it "was capable of confusing

and thereby misleading the jury." Limbach Co. v. Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1259 n.15 (3d Cir. 1991) (citation omitted).

Title VII, ADA, and PHRA-based retaliation claims require proof of three elements: 1) engaging in protected employee activity; 2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and 3) a causal connection between the first two elements.[3] Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 346 (3d Cir. 2022) (citing Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015) and Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)).

The definition of an adverse employment action in Title VII retaliation cases applies equally to ADA retaliation cases. Steidle v. U.S. Liab. Ins. Co., 179 F.4th 193, 205 (3d Cir. 2026). It is a "more relaxed standard[.]" Id. (quoting Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 257 n.6 (3d Cir. 2014)). Specifically, "a plaintiff claiming retaliation under Title VII [and/or the ADA] 'must show that a reasonable employee would have found the challenged action materially adverse' in that 'it well might have dissuaded a reasonable worker from making

[3] The language of the PHRA is substantially similar to the anti-retaliation provisions of Title VII and the ADA; thus, the court interprets the PHRA "as identical" to its federal analogues, "except where there is something specifically different in its language requiring that it be treated differently." Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002).

or supporting a charge of discrimination.' " Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

The court's instructions in this case are taken as a whole and must have informed the jury of the correct legal standard. Harvey, 635 F.3d at 612 (citation omitted). The court referred to the PIP as an adverse action in one of its earlier discrimination instructions.[4] When illustrative examples of adverse actions were being provided to the jury by the court, the jury heard about the PIP as one of those examples.

Additionally, the plaintiff's PIP and her termination were inextricably linked together by the evidence. The jury heard about the PIP and termination together as either being discriminatory and retaliatory or as the result of the plaintiff's job performance. Given the intertwined nature of these events under the circumstances presented here, the omission of the words "performance improvement plan" from the retaliation instructions did not fundamentally impact the jury's consideration of those claims, nor did it prejudice the plaintiff. The jury was adequately instructed with respect to the adverse action portion of plaintiff's retaliation claims.

---

[4] Contrary to any suggestion by the parties, the court did not make a "secret *sua sponte* ruling that [p]laintiff's PIP was not retaliatory[.]" (Doc. 101, Pl. Reply Br. at 2–3).

Going beyond that conclusion, the omission of the PIP from the retaliation instruction does not warrant a new trial if the error is harmless. Harvey, 635 F.3d at 612. Specifically:

> An error is harmless if it is highly probable that the error did not contribute to the judgment. An erroneous jury instruction may also be considered non-fundamental when, taking the instructions as a whole, the erroneous instruction is a solitary misstatement of law buried in an otherwise correct legal explanation.

Id. (quotation marks and citations omitted).

Plaintiff has not demonstrated that this omission mattered to the outcome of the trial. The jury heard evidence about how the PIP and termination were connected. The jury heard the PIP and termination described as adverse actions in the companion discrimination instructions. Then, the jury returned a verdict in favor of Nexstar on all of Grant's claims, for discrimination and retaliation alike. Practically speaking, a PIP measures performance. To reach any verdict, the jurors would have had to consider Nexstar's view of the evidence that Grant's PIP and termination were performance-based. The jurors would also have had to consider Grant's view of the evidence that the PIP was an example of Nexstar papering her employment file to obscure its discriminatory and/or retaliatory reasons for terminating her. Here, after weighing the evidence, the jury determined that Grant's separation from Nexstar was performance-related and not illegal discrimination or retaliation. Therefore, the non-reference to the PIP in

the retaliation instructions did not contribute to the verdict against the plaintiff. Any error to be assigned to the court by the omission is harmless.

**b. Disability Discrimination Claims – Mixed-Motive Instruction**

Next, Grant challenges the discrimination instructions. In this case, the court read a mixed-motive and pretext instruction to the jury regarding plaintiff's Title VII and PHRA sex discrimination claims. The court only read a pretext instruction regarding plaintiff's ADA and PHRA disability discrimination claims. Grant believes the omission of a mixed-motive instruction for disability discrimination compels a new trial in this instance. Neither the law nor the facts are on her side.

Regarding her federal law claims, Title VII and the ADA have their own statutory nuances. Under Title VII, it is an unlawful employment practice to "discharge any individual, or otherwise to discriminate against any individual" with respect to her "terms, conditions, or privileges of employment because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). Additionally, an unlawful employment practice is established under Title VII "when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Title VII provides two discrimination causation standards based on the "because of" and "motivating factor" language. Therefore, the court

provided the jury with a mixed-motive and pretext instruction regarding the plaintiff's sex discrimination claims.

The ADA does not contain a motivating factor causation provision like Section 2000e-2(m). Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to...discharge of employees...and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The "on the basis of" language in Section 12112 establishes the only causation standard that a plaintiff must meet.

After careful consideration of the issue during trial, the court was compelled to apply a but-for causation standard to Grant's ADA discrimination claims.[5] See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. 327, 332 (2020) (noting that the "ancient and simple 'but-for' common law causation test . . . supplies the 'default' or 'background' rule against which Congress is normally

[5] There is no precedential Third Circuit decision for this proposition. A fairly recent non-precedential opinion noted other circuit-level decisions, but "refrain[ed] from ruling on this important issue." Coleman v. Children's Hosp. of Phila., No. 23-3064, 2024 WL 4490602, at *2 n.2 (3d Cir. Oct. 15, 2024). In the absence of binding precedent in this circuit, the court is persuaded by the analysis in DiFiore v. CSL Behring, LLC, 879 F.3d 71, 78 (3d Cir. 2018), which applied a but-for causation test to a plaintiff's claim for retaliation under the False Claims Act after considering the effect of Gross and Nassar. The court is not persuaded by plaintiff's reference to Egan v. Delaware River Port Auth., 851 F.3d 263, 273 (3d Cir. 2017). In Egan, the Third Circuit authorized a motivating factor causation standard for an FMLA retaliation claim. Id. at 274. In doing so, however, the court used Chevron deference to a Department of Labor regulation to fill a gap in the Family Medical Leave Act of 1993. Id. at 273. The Third Circuit has not revisited regulation-deferential FMLA retaliation claims in a precedential opinion since the Supreme Court's decision in Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024). Furthermore, the non-precedential opinion in Coleman called Egan's holding "open to question" based on Loper Bright, but did not revisit the issue. 2024 WL 4490602, at *3 n.4.

presumed to have legislated when creating its own new causes of action[,]" including the federal anti-discrimination laws) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 346–47 (2013) and Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176–77 (2009)); see also Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 63 (2007) ("[i]n common talk, the phrase 'based on' indicates a but-for causal relationship"); Natofsky v. City of New York, 921 F.3d 337, 349 (2d Cir. 2019) (adopting a but-for causation standard for ADA discrimination claims); Gentry v. E. W. Partners Club Mgmt. Co., 816 F.3d 228, 235 (4th Cir. 2016) (same); Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 321 (6th Cir. 2012) (same); Serwatka v. Rockwell Automation, Inc., 591 F.3d 957, 961 (7th Cir. 2010) (same); Murray v. Mayo Clinic, 934 F.3d 1101, 1105 (9th Cir. 2019) (same); Akridge v. Alfa Ins. Cos., 93 F.4th 1181, 1192 (11th Cir. 2024) (same).

Furthermore, Congress did not incorporate Section 2000e-2(m) into the ADA when that statute was amended in 2008. Id. at 1202. Rather, a relevant portion of the ADA reads, as it did at enactment: "The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to . . . any person alleging discrimination on the basis of disability in violation of any provision of this chapter . . . concerning employment." 42 U.S.C. § 12117(a). Section 2000e-2 of Title VII is not included in this

incorporation statute. Consequently, there is no statutory basis for a mixed-motive causation standard under the ADA.[6] The court did not commit error by denying plaintiff's proposed mixed-motive instruction.

To the extent that mixed-motive ADA discrimination claims may be presented to a jury after Gross, Nasser, and Comcast, a plaintiff must produce direct evidence of discrimination. See Labrice v. City of Philadelphia, No. CV 19-4377, 2025 WL 1508022, at *3 (E.D. Pa. May 27, 2025) (Brody, J.) (citing Raytheon Co. v. Hernandez, 540 U.S. 44, 49 n.3 (2003) and Connelly v. Lane Constr. Corp., 809 F.3d 780, 787–88 (3d Cir. 2016)). In Labrice, for example, the plaintiff supplied a document from his employer which indicated that he was rejected from positions due to his status of being "injured on duty." Id. at *4.

Additionally, discriminatory statements may constitute direct evidence of discrimination. Qin v. Vertex, Inc., 100 F.4th 458, 472 (3d Cir. 2024). For instance, in Jacobs v. York Union Rescue Mission, Inc., the plaintiff proffered evidence that her manager made numerous negative comments about her right-hand impairment and later decided to terminate her while she was on medical

---

[6] The court is not persuaded by plaintiff's argument about "Congress's explicit incorporation of Title VII's remedial scheme—including its mixed-motive provisions—into the ADA's enforcement framework." (Doc. 95 at 40) (citing 42 U.S.C. § 2000e-5(g)(2)(B)). Plaintiff's argument has been rejected by many appellate courts in the well-reasoned decisions referenced in the body of this memorandum. See e.g., Lewis, 681 F.3d at 319–20 (Sutton, J.).

leave for carpal tunnel release surgery. No. 1:12-CV-0288, 2014 WL 6982618, at *13 (M.D. Pa. Dec. 10, 2014).

Here, Grant relies on Labrice and Jacobs to support her request for a new trial. Unlike those cases, however, there was no direct evidence of record in this case demonstrating that Nexstar took adverse employment action against the plaintiff due to her disability. For example, plaintiff did not testify to any alleged discriminatory statements about her kidney transplant or her treatment as a transplant recipient. There were no e-mails or other documents presented to the jury with negative references to plaintiff's medical conditions. During trial, plaintiff presented circumstantial evidence to support her view of a suspicious timeline of events and covert prejudice because of her disabilities. That evidence warranted a pretext instruction and a pretext instruction alone.

Grant also looks to state law to support her argument. She asserts that the PHRA independently supports a mixed-motive instruction for disability discrimination claims. Plaintiff, however, did not raise this issue before or during trial or make a PHRA-derived objection to the court's ruling. Instead, the record reflects the following discussion just prior to jury selection:

> THE COURT: Great news, that's a great way to start a Monday.
>
> Number two. On the PHRA, that is not mentioned in your instructions, either side, your verdict slip or your statement

> of the case. How are we proceeding? How are we handling the PHRA claim? How is that going to be addressed?
>
> [PLAINTIFF'S COUNSEL]: So, typically, if at all, in the first instruction where it says, These claims are being brought under Federal law and State law, the State law being the Pennsylvania Human Relations Act, it could just be stated -- and then otherwise the State law is interpreted the same way as Federal law, so there doesn't need to be separate instructions.
>
> THE COURT: So the thing of it is, with the statement of the case that you gave me, it doesn't mention anything about the PHRA, so I'm just going to read it as it is, okay?
>
> [PLAINTIFF'S COUNSEL]: That's fine, Your Honor. I don't think it changes anything.
>
> THE COURT: And, I think, in the preliminary charge, I'm just reading the statement of the case again, okay. In the final charge, we can hammer out how you want it read, if you want it even mentioned, because I understand what you're saying.

(Doc. 85, Day 1, Tr., 2:16–3:12).

During the charging conference, plaintiff did not argue that the text of the PHRA supported a mixed-motive instruction. (Doc. 91, Day 4 Tr., 5:18–12:16). Rather, plaintiff's counsel only specifically objected to the "removal of the ADA mixed-motive instruction." Id. at 13:22-25.

To the extent that this PHRA-related objection to the jury instructions was not waived, the court did not commit error. If the PHRA authorizes a mixed-

motive causation standard for disability discrimination claims, plaintiff did not present any direct evidence of such discrimination at trial.

**c. Determinative Factor Instruction**

Grant also takes issue with the denial of her request to further explain the phrase "determinative factor" in the pretext instructions. The omission of plaintiff's requested verbiage does not warrant a new trial.

To illustrate, the ADA model instruction provides:

> Ultimately, you must decide whether [plaintiff] has proven that [his/her] [disability] was a determinative factor in [defendant's employment decision.] "Determinative factor" means that if not for [plaintiff's] [disability], the [adverse employment action] would not have occurred.

THIRD CIRCUIT COMMITTEE ON MODEL CRIMINAL JURY INSTRUCTIONS § 9.1.2 (2025).

Plaintiff requested the following instruction:

> Ultimately, you must decide whether Ms. Grant has proven that her disability was a determinative factor in Nexstar's decision to terminate her. "Determinative factor" means that if not for Ms. Grant's disability, the termination would not have occurred. <u>Ms. Grant does not have to prove that her disability was the only reason for Nexstar's decision to terminate her.</u>

(Doc. 55 at 7) (underlining in original) (citing <u>Bostock v. Clayton Cnty.</u>, 590 U.S. 644, 656 (2020); <u>Burrage v. United States</u>, 571 U.S. 204, 211-12 (2014)).

The extra underlined sentence above was not read to the jury. (Doc. 91, Day 4. Tr. at 114-15).

Under the law, the court has substantial discretion over the specific wording of jury instructions and need not give a proposed instruction if the essential points are covered by those that are given. Grazier ex rel. White v. City of Philadelphia, 328 F.3d 120, 127 (3d Cir. 2003) (citations omitted). That discretion is conditioned on crafting a jury charge that communicates the substance of the law and does not mislead or confuse the jury. United States v. Petersen, 622 F.3d 196, 203 (3d Cir. 2010) (citing United States v. McGill, 964 F.2d 222, 235 (3d Cir. 1992).

The model instructions read to the jury sufficiently explained determinative factor causation, i.e., but-for causation. In contrast, Grant's extra requested sentence blurred the line between but-for causation and motivating factor causation.[7] In this instance, less was more. Given the option to include a sentence that could mislead the jury into applying a different causation standard or not include that sentence, the court chose the latter.

**d. Adverse Inference Instruction**

Grant also moves for a new trial because the court did not read her proposed adverse inference instruction about Jason Jedlinski's termination. In her post-trial motions, plaintiff argues that she was "systematically deprived of

[7] As detailed above, the jury was not read a mixed-motive instruction with respect to the plaintiff's disability discrimination claims.

discovery concerning [Jason] Jedlinski's termination—the individual whom the evidence established was the driving force behind [p]laintiff's termination." (Doc. 95, Pl. Br. in Supp. at 55). On the fourth day of trial, counsel for plaintiff asserted: "It is undisputed that, when asked under oath why Jason Jedlinski was terminated, every Nexstar witness, including Jason Jedlinski, claimed they either did not know or could not recall. It is undisputed that documentation regarding Jedlinski's involuntary termination exists or at one time existed." (Doc. 91 at 25:9–20).

However, plaintiff's request for an adverse inference instruction came too late and was not accompanied by the evidence necessary to support such an instruction. Specifically, plaintiff failed to lay any groundwork for an adverse inference instruction through a pretrial motion to compel and motion for sanctions. See FED R. CIV. P. 37(a)(3)(B)(iv), (b)(2)(A), (e)(2). Plaintiff did not even include reference to the issue in her pretrial memorandum. Rather, the issue first appeared in proposed jury instructions submitted prior to the trial. The proposed instruction was accompanied by case law setting forth standards for Rule 37(e) sanctions, (Doc. 55 at 13), but not any supporting evidence for the court to weigh any "key considerations," Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994) (setting forth factors to consider when evaluating the appropriateness of sanctions).

Even if the charging conference was the best first time to raise the issue, the court was never provided any copies of plaintiff's discovery requests, defendants' discovery responses, lawyer correspondence, or witness deposition testimony to support counsel's advocacy. The first time any discovery materials related to Jedlinski's termination were supplied was after trial. Those materials were supplied by Nexstar, not the plaintiff, in the form of Jedlinski's deposition testimony. (Doc. 100-4). Any relevant information related to an adverse inference charge from that deposition was never presented. Thus, it was not error to omit plaintiff's requested adverse inference instruction from the charge provided to the jury.

**2. Exclusion of Complaints to Human Resources About Wil Danielson**

Grant also assigns error to a decision granting Nexstar's motions in limine regarding evidence of other employee complaints about Wil Danielson. Grant v. Nexstar Media Grp., Inc., No. 4:23CV1932, 2025 WL 3188404, at *7–11 (M.D. Pa. Nov. 14, 2025). The decision to exclude traces back to the same single document: the deposition testimony of Emily Anderson, a former HR employee of Nexstar, which plaintiff sought to read to the jury. (Docs. 65 (transcript) and 69 (proposed designations)).

Plaintiff refers to this ruling as an improper blanket exclusion of evidence in a discrimination case. In this circuit, there is a noted "judicial inhospitability to

blanket evidentiary exclusions in discrimination cases." Glass v. Phila. Elec. Co., 34 F.3d 188, 195 (3d Cir. 1994). After all, "the question facing triers of fact in discrimination cases is both sensitive and difficult[,]" and "often obliges [them] to inquire into a person's state of mind." U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983). When a court imposes an across-the-board restriction on testimony, it must be supported by the record. See Quinn v. Consol. Freightways Corp. of Del., 283 F.3d 572, 578 (3d Cir. 2002).

Prior to trial, Anderson was the only source of testimony concerning the other complaints about Danielson to Nexstar HR. Ultimately, after briefing, evidentiary objections to designations, and oral argument, Anderson's deposition testimony was excluded on a number of grounds, all previously discussed at length. 2025 WL 3188404, at *7–11.

At trial, plaintiff did not make any additional efforts to inquire into other-complaints evidence. Danielson and Nexstar's Senior Vice-President of HR, Terri Bush, both testified during the trial. Plaintiff did not attempt to question Danielson directly about the other complaints. Plaintiff did not seek to question Bush about any personnel issues involving Danielson. Consequently, when plaintiff re-raised the arguments offered in opposition to Nexstar's motions in limine at the end of witness testimony, the court had no basis to reconsider its pretrial ruling. (Doc. 90, Day 3 Tr. at 215–19). Other complaints evidence

regarding Danielson would have come in solely through objectionable deposition testimony that was properly excluded.[8] Thus, any blanket exclusion of evidence that occurred in this case was supported by the record.

**3. Permitting the Testimony of Karen Brophy**

Additionally, Grant moves for a new trial because the court permitted the testimony of Karen Brophy as the ultimate decisionmaker who imposed plaintiff's performance improvement plan and directed her termination despite the omission of Brophy's name from defendants' initial disclosures, interrogatory answers, and first witness list. Despite plaintiff's arguments about trial by ambush and discovery abuses, Brophy's ostensible role was known to the plaintiff as early as October 2024 when plaintiff deposed Wil Danielson.[9] (Doc. 88 at 128:7-11). This trial occurred in November 2025. Any duty to supplement by Nexstar was alleviated by additional information made known to the plaintiff during the discovery process. See FED R. CIV. P. 26(e)(1)(A) (requiring a party to supplement its required disclosures in a timely manner if "the additional or

---

[8] "A trial court is afforded substantial discretion when striking a Rule 403 balance with respect to proffered evidence[.]" McKenna v. City of Philadelphia, 582 F.3d 447, 461 (3d Cir. 2009). To compound the danger of unfair prejudice, which, among other reasons, justified precluding Emily Anderson's deposition testimony under Federal Rule of Civil Procedure 403, Grant's counsel re-raised the issue after Danielson had been excused from the proceedings and was traveling back to his home in Los Angeles.

[9] Although such evidence was not presented to the court during trial, Nexstar's opposition brief details the number of times Brophy's role in Grant's PIP and termination was disclosed to the plaintiff during discovery. (Doc. 100 at 28–32).

corrective information has not been otherwise known to the other parties during the discovery process"). Nexstar also amended their witness list approximately 30 days before trial to include Brophy. (Doc. 56). Plaintiff was thus on notice of this witness and what she might say. Therefore, the decision to permit Brophy's testimony is not grounds for a new trial.

**4. Permitting Evidence of Plaintiff's Earnings and Mitigation Efforts / Challenge to the Venire**

Finally, Grant argues that it was error for the jury to be presented with evidence of her earnings and mitigation efforts during the trial. Such arguments rely on the plaintiff's age, gender, and socioeconomic status. Her brief in support asserts:

> Plaintiff is a woman who, at the time of her termination, was earning $525,000 annually at the age of 35 working in sales. The jury was comprised of 8 men, many retired, who earn a fraction of that.[3]
>
> ---
>
> [3] The jury was comprised of men from Lackawanna, Luzerne, Monroe, and Schuykill [sic] counties. The average per capita income of those counties is $33,949. See https://www.census.gov

(Doc. 95 at 52 and n.3).

Relating to the above, plaintiff believes that "[t]he only logical explanation," for the adverse verdict, "is that the jury's decision was influenced by bias against a high-earning woman[.]" Id. at 55.

The court construes the above arguments to assert two different things: 1) a post-trial objection to the venire; and 2) a challenge to the denial of a motion to bifurcate lodged by the plaintiff at the start of trial.

The court will address these issues in reverse order. On November 7, 2025, at a pretrial conference, the undersigned provided notice to the parties that all facts in this case would be tried to a jury, even though their determinations relative to back pay and front pay would only supply an advisory opinion. See FED. R. CIV. P. 39(c)(1) (permitting a court to try any issue with an advisory jury on its own motion); Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 78 n.1 (3d Cir. 2009) (explaining that a jury's role is only advisory to the issues of back pay and front pay because they are equitable remedies to be determined by the court). On November 14, 2025, the court issued a memorandum and order denying plaintiff's motion in limine to preclude evidence or testimony about the plaintiff's failure to mitigate damages. 2025 WL 3188404, at *4–7. Therein, the court noted that all evidence related to Grant's alleged damages was presumed to be relevant at trial. Id. at *4. Although plaintiff's motion in limine was denied, it was denied without prejudice. Rulings on evidentiary issues related to the plaintiff's mitigation efforts were reserved for reconsideration in the context of trial. Id. at *7.

The following Monday, November 17, 2025, was the first day of trial. Prior to jury selection, plaintiff made an oral motion to bifurcate the issue of the plaintiff's economic damages. (Doc. 85, Day 1 Tr., at 10). Plaintiff's counsel argued:

> Ms. Grant, like, we normally -- the jury is not hearing how much money she makes, how much money she lost, she was, obviously, a very high-earner, and the jury could be distracted by that amount or have their decision on liability influenced by her income, which would not be fair, because their decision, at this stage, is just did she -- was she retaliated against, was she discriminated against, that's what the jury is focused on.

Id. at 12:5-12.

Defense counsel argued:

> the salary -- compensation here is not just relevant to the economic loss, it's relevant to expectations, it's relevant to performance, it's relevant to the commissions piece, Plaintiff's work, it's relevant to the loss of her largest client, as part of her performance, it's all wrapped up.

Id. at 13:16-21.

The motion to bifurcate was then denied. Nexstar indicated that plaintiff's salary and commissions were relevant to its defense that the plaintiff's underperformance was the reason for her termination. Additionally, because the amount of plaintiff's compensation was commission-heavy, such evidence was relevant to the plaintiff's position that she met and even exceeded Nexstar's expectations, i.e., that the reasons articulated for the plaintiff's termination were

pretext for discrimination and/or retaliation. The mutual benefit to the parties from this ruling was apparent even during the first few minutes of the trial. During opening argument, plaintiff's counsel stated:

> When she was hired at *The Hill*, this was in 2015, so she gets hired at *The Hill*, and she's working in Sales. Essentially, what she's doing is getting companies to buy ads for *The Hill* publication, which was a political publication that had paper that would go out and, actually, be delivered or digital sales that were online. And she worked for seven years very, very successfully. She was a rock star. She was shining. Most of her income was based upon commissions, so if she wasn't doing a good job, she wouldn't be paid, and she was making a tremendous amount, particularly, for her age, because she was selling so much and she was good at it, so driven at it.

(Doc. 87, Day 1 Tr., 17:6-17).

In contrast, defendants' counsel argued:

> I'm going to tell you that the single most important piece of evidence that you're going to hear in this case is that, at the time of her termination, Brittany Grant was making $525,000 a year, and her and her sales team missed its goals by $2 million, by 50 percent.

Id., 32:6-10.

As noted in the review of the evidence above, this employment discrimination trial proceeded in a typical fashion where the plaintiff's earnings were tied to her performance, and her performance was the stated basis for her termination. It was not atypical to admit such evidence, and it was not so unfairly prejudicial to the plaintiff that it warrants a new trial.

It was also not error for evidence of mitigation to be presented to the jury. The jury would have been tasked with awarding emotional damages had they determined that Nexstar discriminated or retaliated against the plaintiff. In addition, the jury would have also been tasked with rendering an advisory opinion on economic damages had they determined Nexstar was liable.

As for emotional damages, Grant specifically testified to the impact the termination had on her and the issues it created in starting a family and affording transplant rejection medication. (Doc. 88, Tr. Day 2, 180:23–184:19). During her testimony, the plaintiff also introduced an exhibit documenting her job search efforts during the times she was unemployed and she explained both the emotional and financial stress those periods caused. Id., 187:2–192:8. Specifically, her counsel had her raise a thick exhibit binder full of documents containing her job applications. Id., 194:17-23.

On cross-examination, Grant was asked about one of those applications, a position at Cintas with the potential to earn $250,000 with insurance benefits after the plaintiff had been out of work for five months. Id., 196:25–203:9. Plaintiff was also cross-examined using her deposition transcript where she laughed about this position because it involved selling fire extinguishers. Id. Given the ruling on her motion in limine, if the plaintiff believed this evidence was unfairly prejudicial at the time such questions were asked, the court left open her

ability to make an objection. However, the only objection from plaintiff's counsel was to the way defense counsel was confronting the plaintiff with her deposition testimony. Id.

That leaves Grant's objections to the demographics of the jurors who served in her case, objections which were raised long after trial. The reality is that plaintiff's counsel had an equal role in selecting eight jurors from the 32 citizens summoned to the courtroom for voir dire. (Doc. 77). During jury selection, plaintiff did not request that those potential 32 jurors be seated differently or re-randomized. Furthermore, to the extent that plaintiff argues that she was prejudiced by an all-male jury made up of many retirees, she used one of her peremptory challenges on a 48-year-old woman with a bachelor's degree. Id. Only two of the eight jurors listed their occupation as retired. Id. As a result, plaintiff's belated objection to the venire lacks merit and does not warrant a new trial.

**Conclusion**

For the reasons set forth above, Brittany Grant's post-trial motions will be denied. An appropriate order follows.

**Date:** 8/24/26

**JUDGE JULIA K. MUNLEY**
**United States District Court**